THE MANITOU.

(District Court, S. D. New York. May 19, 1902.)

1. SHIPPING—EXEMPTIONS IN BILL OF LADING—STIPULATIONS AGAINST NEGLIGENCE.

   Exemptions in a bill of lading which are brought into operation by the negligence of the shipowner or his servants are not enforceable in the courts of this country.

2. SAME—DAMAGE TO CARGO—UNSEAWORTHINESS.

   Cargo stowed in a hold was damaged on a voyage from London to New York by steam which escaped into the hold through valves placed in an iron box on the deck above for use in case of fire. These valves were located on one branch of a steam pipe, the other branch of which led to a winch and a windlass. The admission of steam into the main pipe was controlled by a valve in the engine room, which was closed shortly after the ship sailed, and remained closed until she was nearly to New York, when it was opened for the purpose of testing the windlass, preparatory to its use in discharging cargo. It was conceded that the damage occurred thereafter. The box in which the three fire valves were placed was locked before the ship sailed, and it was supposed that the valves were closed. The admission of the steam to the valves in the box was further controlled by another valve in the branch pipe leading to them, and after the presence of steam in the hold was discovered such,

valve and two of those in the box were found to be partially open. *Held*, that such facts made it incumbent on the ship, in order to escape liability, to show that such valves were properly and thoroughly inspected and closed before the voyage began, and that, in the absence of direct and credible evidence establishing such facts, the leakage must be attributed to the unseaworthy condition of the ship in that respect at the beginning of the voyage, and she was not exempt from liability under the Harter act.

.8. SAME—HARTER ACT—DUE DILIGENCE TO MAKE VESSEL SEAWORTHY.

To constitute due diligence on the part of a shipowner to make the vessel "in all respects seaworthy" at the beginning of a voyage so as to entitle him to the benefit of the exemption contained in section 3 of the Harter act, it is not sufficient to provide her with proper structures and equipment, but due diligence must also be exercised by the owner's servants in the use of such equipment before and up to the time of the beginning of the voyage.

In Admiralty. Suit to recover for damage to cargo.

Butler, Notman, Joline & Mynderse, for libellants.
Convers & Kirlin, for claimant.

ADAMS, District Judge. This action is upon a libel filed by Dodge :and others to recover damages sustained by them through injury to their merchandise, of a general character, while on board the steamship Manitou, on a voyage from London to New York in May, 1899. The cargo was shipped in London in good order and upon delivery here was found to be in a greatly damaged condition. No sea perils were encountered upon the voyage. The damage was occasioned by the escape of steam into the hold where the goods were stowed. The question to be determined is, whether the steamship can obtain exoneration from liability for the damage under certain exceptions contained in the bills of lading or from the provisions of the Harter Act.

These goods were stowed in No. 1 hold. Leading to the windlass on the deck above the hold, was a main steam pipe running along the deck from the engine room at the after part of the ship for the purpose of supplying the forward parts with steam. On the same deck, back of the windlass, was a winch, which was supplied with steam from a branch pipe running from the main pipe. This branch pipe forked into two pipes, one leading to the winch, and the other leading to and ending in a small iron box, on the same deck, covered with a thin steel plate, in which were three small valves. These valves were designed to admit steam for fire extinguishing purposes into the underneath hold, consisting of the lower hold, orlop deck and the betweendecks. This whole system of pipes was controlled by a valve in the engine room. When this was opened, the admitted steam went without obstruction to three main valves; one at the windlass, one at the winch and one in the vicinity of the iron box mentioned, containing the small valves. The main valves were called in the testimony respectively F, C and D. Valve F was at the windlass and valve C was at the winch. Valve D, near C, controlled the admission of the steam into the three valves in the box, which has been called E, and was designed as an extra guard, in addition to the valves in E, against the steam reaching the cargo, unless it should be desired to turn it into the hold in case of fire. There were also valves for the exhaust steam used

at the windlass and the winch, called A and B. The valves in box E were operated with fixed handles. Valves C, D and F were operated by means of wrenches or hand wheels fitting on square-headed spindles. The hand wheel specially designed for the spindle on D was kept in the chart room. Valves A and B were operated by removable hand wheels, which fitted the spindle on D sufficiently well to be serviceable for operating that valve. A and B were ordinarily left open, being closed only when the windlass or winch was undergoing repairs to keep the exhaust steam from reaching them. The valve D and the valves in E were ordinarily kept closed. Testimony on the part of the vessel is given to the effect that the valve D and the valves in E were tightly closed before the vessel entered on the voyage and that there was no apparent escape of steam into the compartment until the voyage was practically ended. When the steamer reached the vicinity of Sandy Hook, steam was turned into this system of pipes to ascertain whether the windlass was in order and everything prepared for anchorage. About two hours later the steamer reached Quarantine Station, and anchored over night. The next morning it was reported to the chief officer that the bulkhead in No. 1 hold was hot. It was supposed that fire had broken out in the hold and the chief officer so reported to the master, who directed that one of the hatch covers be taken off. When that was done a great volume of steam issued from the hold. An investigation immediately followed and it was found that valve D and two of the valves in E were open. They were at once closed, the hand wheel of A or B being used to close D, and the escape of steam ceased. It is not disputed by the steamer that the damage to the cargo was caused by this steam but it is insisted that the circumstances disclose no basis for liability on her part.

It is evident that the damage occurred either from unseaworthiness on the part of the steamer in not being fitted to carry her cargo in safety or from some negligence of her servants and unless she can exonerate herself through the stipulations of the bill of lading or the provisions of the Act, she must respond therefor.

The bills of lading contain numerous exceptions designed to protect the carrier, including among them one against liability for damages by steam, and if they are permitted to prevail, there can be no recovery. It is well established, however, that exceptions in a bill of lading, which are brought into operation by negligence of the ship owner or his servants, are of no avail in this country and no further attention need be given to those relied upon here. Harter Act, §§ 1, 2; Knott v. Botany Mills, 179 U. S. 69, 21 Sup. Ct. 30, 45 L. Ed. 90; The Kensington, 183 U. S. 263, 22 Sup. Ct. 102, 46 L. Ed. 190.

It is also urged that a provision in the bill of lading against liability for any damages to goods capable of being covered by insurance is protection in this case as the goods fell within that description. It is conceded by the claimant that such a clause does not protect the carrier when defects in the hull or equipment or negligence are shown (Carv. Carr. by Sea [3d Ed.] § 105; The Hadji [D. C.] 16 Fed. 861, 865; Id. [C. C.] 20 Fed. 875); but it is contended that the libellants have not sustained the burden of proof to show negligence. This

contention is answered by the evident fact of negligence appearing from the circumstances of the case.

The real controversy is, whether the facts are such as to bring the provisions of the Harter Act into operation for the vessel's benefit. There can be no doubt as to the vessel's general fitness for transporting cargo and that she was supplied with all proper devices to render its carriage safe. But were the devices properly used while the vessel was in port and still under the owner's control? Did the owner then exercise due diligence to make the vessel in all respects seaworthy? Much testimony has been given on the part of the vessel to show that every proper precaution was taken and that every valve was closed before the vessel went to sea, but all testimony given under these conditions requires close scrutiny and it is not necessarily to be accepted unless found to be inherently worthy of belief. Where an account of circumstances leading to a loss is entirely within the control of one side of a controversy, there is more of a burden upon such party than where the matter has been open to the other side for an ascertainment of the facts. The Alaska (D. C.) 27 Fed. 704, 710; Id. (C. C.) 33 Fed. 107. Several witnesses here testified positively to an inspection of the valve D and those in box E before the sailing and that they were closed. One was the marine superintendent of the claimant in London, who was examined on commission to London. It is shown that the box E was usually padlocked and this witness said that it was opened and repadlocked in his presence, and that of the first officer and carpenter of the ship, on the occasion of the examination. Under the closing general interrogatory he said that it was an impossibility for those boxes to be closed and locked without the steam plugs, i. e. the valves, being properly screwed down, proving that the valves could not have been open so as to admit steam into the hold. Another positive witness was the third officer of the steamer. On cross-examination, it appeared that he had no actual knowledge of the matter. The testimony of these witnesses was corroborated in an argumentative manner by the first officer, who was examined in the same manner. He said in substance that the valves must have been in good condition because otherwise the steam would have escaped into the hold before the sailing and would then have been noticed, but he did not say that the valves were examined at the time the superintendent said he had examined them. The first officer did say that he was certain that the valves were not open three days after sailing when a ventilation leading to the hold was then opened. I do not regard the testimony of the witnesses produced of sufficient value to establish the defence. It is contradicted in various ways tending to show that the witnesses were, at least, mistaken. For example, it appeared by an examination made of the box E in December, 1900—and it is established that the box and the valves in it were then in the same condition as in May, when the damage was done—that instead of there being no room when the lid of the box was closed and locked for the valves to be open, as testified to, there actually was an inch of space between the top of the valves and the lid of the box, leaving ample room for the valves to be fully

open when the box was tightly closed. There were eight of these boxes on the steamer, and it may safely be concluded that if the officers made such thorough examinations as they testified to, that they were not of this box. Another positive witness for the claimant was the master of the vessel, who said that he examined the valves daily and that they were in good condition, and closed at time of sailing; but his testimony is thoroughly discredited by the fact that he testified positively to a minute description of the pipes and valves, which was subsequently found to be entirely inaccurate. He further said that the examination was in conformity with a practice which was still existing when he testified in December, 1890, yet upon an examination of the box on the day his testimony was given, it was found that the box contained a rat's nest and some live rats. Such incident seems scarcely consistent with a continued daily examination of the box.

The steamer's theory of the accident first presented, in the testimony of the master, was that the carpenter, being charged with the duty of preparing the windlass for the anchoring, had ignorantly opened valve D and the valves in box E, the latter by breaking open the box, for the purpose of getting sufficient steam, and the steam found its way into the hold through the mistake of the carpenter. These valves were at least forty feet distant from the windlass and had no connection whatever with it. It would be difficult to believe even direct testimony to the effect that a carpenter of a steamer of this character could have been so densely ignorant of his duties. The chief engineer said that the carpenter complained prior to the anchorage at quarantine that there was not sufficient steam at the windlass and that he subsequently denied opening the valve D. The carpenter was named in the claimant's commission to London but was not produced for examination, on the alleged ground that he could not be found. When the commission was returned without this important deposition, the proctors for the libellants notified the proctors for the claimant of the carpenter's London address and offered to consent to a return of the commission for further execution in this respect. This offer was declined and the claimant's proctors stated their intention to adhere to the commission as it stood. In this state of affairs, the claimant must abide by such proper inferences as may be drawn from the absence of the testimony of this witness (Waterhouse v. Mining Co., 38 C. C. A. 281, 97 Fed. 466, 477; The New York, 175 U. S. 187, 204, 20 Sup. Ct. 67, 44 L. Ed. 126); and it may be assumed that the carpenter's testimony would not only not have sustained any theory of mismanagement on his part, as representing the vessel, and thus tending to bring the matter within the provision of the Harter Act, but would have contradicted any such theory. The case is devoid of any direct credible testimony showing that the valves were closed before or at the time of sailing or that they were opened during the voyage and the conclusions of the witnesses that they must have been so closed and opened are not sufficient to establish either fact. It is clear that box E was not opened for examination and that no actual tests were made of any of the valves. When the steam

got into the hold, valve D was only open three-fourths of a turn out of a possible opening of two and a half turns, and it seems evident that merely looking at the valves in a perfunctory way would not have shown this opening.

Much stress is laid in the claimant's argument upon the fact that no noticeable steam escaped into the hold after the vessel sailed and hence these valves must have been closed until the steamer was in the vicinity of New York and testimony was given to show that the box E had been forced open. I consider it much more likely that if the box was forced open, it was for the purpose of getting at the valves to close them, when the escape of steam was discovered, rather than with a view of opening them to improperly admit the steam. A similar feature of the case is the contention on the part of the steamer's witnesses that if the valves had not been closed before sailing, the escaping steam would have been observed by those working in the hold before it was finally closed for the voyage, but such testimony cannot have much weight because of its argumentative character. Too many unproved circumstances—e. g. the quantity of admitted steam; the opportunity for condensation and for escape through the open hatches; the vigilance of those having opportunity for notice; their inclination to report, etc.—might affect a consideration of the matter, if proved, to let it have any serious bearing, without them. Moreover, it is not at all clear that this hold was not closed before the vessel left port. Several witnesses, whose testimony I have already commented upon, have stated that the hold was open for the reception of cargo after the hatches were on the other holds, but the log shows that this hold was finished at 10 o'clock, while other holds were not finished for half an hour later, and if this were the fact, argument relative to the probability of escaping steam being observed before the vessel sailed loses much of its force. It must be borne in mind, too, that this system of pipes was controlled by a special valve in the engine room. The engineer in charge testified that he turned off the steam by this valve shortly after leaving London. Therefore, although the valve D and those in box E were open when the vessel sailed, there would have been no steam admitted to the hold during the voyage until it was turned on by the opening of the engine room valve, when the steamer neared Sandy Hook. It was said that at this time the carpenter complained that he could not get steam enough to work the windlass. An attempted explanation of such a condition was made by a statement on the part of the engineer that the windlass journals get rusted with salt water, rendering it difficult to turn them at first, but it seems more probable that the difficulty was caused by a deficiency of steam at the windlass, owing to its escape into the hold.

Altogether, I conclude that the valves were not properly closed before the steamer sailed.

The claimant has strenuously urged that even if this conclusion should be reached, there can be no recovery under the adjudicated cases, citing The Mexican Prince (D. C.) 82 Fed. 484; Id., 34 C. C. A. 168, 91 Fed. 1003; The Mexican Prince, 174 U. S. 801, 19 Sup. Ct. 887, 43 L. Ed. 1187; The Sandfield (D. C.) 79 Fed. 371; Id.,

34 C. C. A. 612, 92 Fed. 663; The British King (D. C.) 89 Fed. 872; Id., 35 C. C. A. 159, 92 Fed. 1018; The Glenochil [1896] Prob. 10, 11; Blackburn v. Navigation Co., Shipping Gazette (Dec. 6, 1901) p. 777; The Silvia (D. C.) 64 Fed. 607; Id., 15 C. C. A. 362, 68 Fed. 230; Id., 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241; The Strathdon (D. C.) 89 Fed. 374; Carv. Carr. by Sea (3d Ed.) pp. 128, 129, § 103E. I do not deem it necessary to analyze and distinguish these authorities, because the principle here involved has been recently passed upon by the Supreme Court in the case of International Nav. Co. v. Farr & Bailey Mfg. Co. (decided April 22, 1901) 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830. In that case the carrier was held liable. There, the ports of the vessel were inspected before the vessel sailed and were believed to be closed, but the covers of one of the ports were actually open, with the result that, without any severe weather or accident happening, the sea found access through the port to the cargo and injured it. The Silvia, supra, which was a case of the outside cover of a port hole being left open at time of sailing, and held not to constitute unseaworthiness, was distinguished on the ground that there, the cover was designedly left open at the time of sailing, the weather being fair, for the purpose of lighting the cargo compartment, and the negligence consisted of failing to close it, as could easily have been done, when bad weather came on, which was a fault of management under the Act and did not constitute unseaworthiness. In the case being then considered, the covers were intended to be securely closed before any cargo was received and the person whose duty it was to close the ports, or see that they were closed, supposed that had been properly done and that hatches were closed with no expectation that any more attention would be given to them during the voyage, but in fact the port in question was not closed; hence the vessel was found to have been unseaworthy and not within the exemption from liability provided by the Act. It was there said by Mr. Chief Justice Fuller, in writing the opinion of the court (pages 224–226, 181 U. S., page 593, 21 Sup. Ct., and page 830, 45 L. Ed.):

"But it is contended that in spite of the fact that the condition of the port hole rendered the ship unseaworthy when she sailed, the omission to securely cover it was a fault or error in management and within the exemption of the third section of the Harter Act. The proposition is that if an owner provides a vessel properly constructed and equipped, he is exempted from liability no matter how unseaworthy the vessel may actually be, at the commencement of the voyage, through negligent omission or commission in the use of the equipment by the owner's servants. Or, to put it in another way. If the unseaworthiness is not the result of error or fault in management, the third section does not apply, and even if it were, the exemption still cannot obtain unless it appears that the owner used due diligence to make the vessel seaworthy. And it is said that the owner does exercise such diligence by providing a vessel properly constructed and equipped, and that while he is responsible for the misuse or nonuse of the structure or equipment by his 'shore' agents, he exercises due diligence by the selection of competent 'sea' agents, and that he is not responsible for the acts of the latter, although they produce unseaworthiness before the commencement of the voyage.

We cannot accede to a view which so completely destroys the general rule that seaworthiness at the commencement of the voyage is a condition

precedent, and that fault in management is no defence when there is lack of due diligence before the vessel breaks ground.

We do not think that a ship owner exercises due diligence within the meaning of the act by merely furnishing proper structure and equipment, for the diligence required is diligence to make the ship in all respects seaworthy, and that, in our judgment, means due diligence on the part of the owners' servants in the use of the equipment before the commencement of the voyage and until it is actually commenced.

The ruling in Dobell & Co. v. Steamship Rossmore Co., [1895] 2 Q. B. 408, is in point. The Rossmore left Baltimore with a port improperly caulked, which rendered the vessel unseaworthy, through the negligence of the ship's carpenter, who was a competent person. Sea water entered through this port and damaged the cargo. The bill of lading incorporated the Harter Act by reference, and it was held, as correctly stated in the syllabus, that 'to exempt the ship owner from liability it was not sufficient merely to show that he had personally exercised due diligence to make the vessel seaworthy, but that it must be shown that those persons whom he employed to act for him in this respect had exercised due diligence;' and that, therefore, the negligence of the ship's carpenter prevented the exemption from applying, and the ship owner was liable.

The obligation of the owner is, in the language of section two of the act, 'to exercise due diligence, to properly equip, man, provision, and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage;' and that obligation was not discharged when this vessel sailed with a hole in her side, under the circumstances disclosed, whether the duty of seeing that it was closed devolved on officers of the ship, or the foreman of the stevedores, or on all of them. The obligation was to use due diligence to make her seaworthy before she started on her voyage and the law recognizes no distinction founded on the character of the servants employed to accomplish that result.

We repeat that even if the loss occur through fault or error in management, the exemption cannot be availed of unless the vessel was seaworthy when she sailed, or due diligence to make her so had been exercised, and it is for the owner to establish the existence of one or the other of these conditions. The word 'management' is not used without limitation, and is not, therefore, applicable in a general sense as well before as after sailing."

In the case at bar, it was the intention that the valves should be closed before the vessel sailed and there was no expectation of their use after that time, until the vessel should be near her destination. At that time, the steam was turned on at the engine room without investigation of the valves D and in box E, because it was supposed that they had been tightly closed. I consider that this case falls within the principle of International Nav. Co. v. Farr & Bailey Mfg. Co.; also of The Manitoba (D. C.) 104 Fed. 145, where Judge Brown had previously reached practically the same conclusion as the Supreme Court with respect to the liability of the carrier upon a somewhat similar state of facts.

It has been urged by the libellants that even if the valves were tightly closed when the vessel sailed, that the claimant cannot succeed, because the Act does not exempt the carrier from mismanagement during the voyage in the care or custody of cargo and further that the fire apparatus could not in any sense be deemed as having anything to do with the navigation or management of the vessel, but in view of the result at which I have arrived, I do not deem it necessary to consider such contention.

Decree for the libellants, with an order of reference.