FRANK WATERHOUSE, Limited, et al., v. ROCK ISLAND ALASKA MIN. CO.

(Circuit Court of Appeals, Ninth Circuit. October 19, 1899.)

No. 534.

1. APPEAL—REVIEW—HARMLESS ERROR—ADMISSION OF EVIDENCE.

An erroneous admission in evidence of an instrument which, because not properly stamped, was inadmissible under the provisions of the war revenue act of 1898, was harmless, where the instrument was set out in the complaint, and its terms were not in dispute; the only issue thereon made by the pleadings being as to the authority of the agent executing the same on behalf of the defendant.

2. SHIPPING—POWERS OF MASTER—CHARTER OF VESSEL TO COMPLETE VOYAGE.

Defendant, a corporation which was the owner of an ocean steamship, contracted to transport passengers and freight from London, England, to Dawson City, on the Yukon river. On the arrival of the ship at St. Michaels, which was the end of her voyage, and where defendant had arranged to transship her passengers and cargo to other vessels for the remainder of the transportation, such other vessels had not arrived. Held, that it was within the powers and was the duty of the master of the steamship to take such reasonable measures as were necessary to carry out the contract of his employer, and earn for it the passage money and freight, by delivering his passengers and cargo at the point of destination, and that a charter of another vessel for that purpose, executed by him in good faith, and in the exercise of a reasonable discretion, was binding on the defendant.

3. SAME—ACTION FOR CHARTER HIRE—DAMAGES FOR DEFECTS IN VESSEL.

Where the undisputed evidence showed that a vessel was examined by a charterer, and accepted by him with full knowledge of the condition of her machinery and appliances, it was not error to instruct the jury, in an action to recover her hire under the charter, that claims set up by defendant on account of damages and delays alleged to have resulted from the defective condition of such machinery and appliances should not be considered unless the defects complained of were latent and unknown to defendant.

4. EVIDENCE—PRESUMPTION FROM FAILURE TO CALL WITNESS.

A jury is authorized to infer from the absence of a person, shown to have particular knowledge of the matters in controversy, beyond the reach of a subpoena, and from the fact that his absence was facilitated by one of the parties, that his testimony would not have been more favorable to such party than that of the witnesses who testified.

5. APPEAL—MATTERS REVIEWABLE—FEDERAL PRACTICE.

The overruling of a motion for a new trial is not assignable as error, under the practice established in the courts of the United States.

In Error to the Circuit Court of the United States for the Northern Division of the District of Washington.

This action was brought in the circuit court for the district of Washington by the Rock Island Alaska Mining Company, the appellee, against the corporation styled Frank Waterhouse, Limited, appellant, to recover the sum of $21,055.19, with interest, alleged to be due on a certain charter party, and for merchandise furnished and services rendered to the said appellant by the appellee. The cause was tried by the court and a jury, resulting in a verdict for the appellee (plaintiff below) in the sum of $18,919.19, with interest and costs of suit, and is brought to this court on a writ of error sued out by the defendant in the court below, and its surety on a bond given to secure the release of attached property.

The litigation arose from the following transactions and circumstances:

The Rock Island Alaska Mining Company (hereafter referred to as the "Rock Island Company") is an Iowa corporation, and in July of 1898 was the owner of two steamers, the Rock Island and Rock Island No. 2, which were lying in the harbor of St. Michaels, Alaska. This corporation was at that time represented at St Michaels by H. U. Crockett, its vice president, E. L. Kahlke, its secretary, and William C. Knaack, its general manager. Frank Waterhouse, Limited (hereafter referred to as the "Waterhouse Corporation"), is a British corporation, organized early in 1898, and from the time of its organization has had its chief office in America at Seattle, Wash.; Frank Waterhouse being the American manager of said corporation, in charge of its Pacific Coast business, and residing at Tacoma, Wash. This corporation was the owner of the British steamship Garonne, which sailed from London, England, on April 2, 1898, with a partial cargo and a number of passengers bound for St. Michaels, via Victoria and Vancouver, British Columbia. In June, 1898, the ship left Victoria with a full cargo and full list of passengers, arriving in St. Michaels harbor about July 4th; Capt. C. G. Conradi being the master in charge thereof. To nearly all of the passengers tickets had been sold by the Waterhouse Corporation beyond St. Michaels to various points on the Yukon; the tickets issued on the prepayment of fare being two-coupon transportation tickets, one coupon calling for passage on the Garonne to St. Michaels, and the other being an order on "Agent Connecting Line, St. Michaels, Alaska," for one ticket from St. Michaels to Dawson, to be charged to the account of the Waterhouse Corporation. The Garonne also carried to St. Michaels 177½ tons of freight, including 43½ tons belonging to the Waterhouse Corporation, consisting of clothing, blankets, hardware, and drugs, all of which was consigned to Dawson. The Waterhouse Corporation had received in advance as freight upon the cargo a sum exceeding $16,000, and a further sum of about $8,000 was to be collected upon delivery of the consigned goods at Dawson by an employé of the corporation who was proceeding to Dawson on the Garonne. It appears that it was the intention of the Waterhouse Corporation to transfer the passengers and cargo of the Garonne to a river steamer at St. Michaels, the Robert Kerr, which was to be operated by F. W., Limited, a corporation organized to engage in river transportation on the Yukon in connection with the ocean transportation of the first-named corporation. Frank Waterhouse, manager of both corporations in this country, had contracted with a firm in Seattle to construct the steamer Robert Kerr and send it to St Michaels in time for the opening of navigation on the Yukon river. The Waterhouse Corporation had also contracted with the Milwaukee-Alaska Gold-Dredge Mining Company for exchange of business with the latter's river steamer Milwaukee. It was expected by the Waterhouse Corporation that both of these steamers would be at St. Michaels upon the arrival there of the Garonne, and it sent by the Garonne a master, purser, and pilot, under contract of employment for the season on the Yukon river upon the Robert Kerr, or any other river boat selected by the Waterhouse Corporation. When the Garonne arrived at St. Michaels on July 4, 1898, neither of the expected river steamers, the Robert Kerr or Milwaukee, had arrived. Capt. Conradi looked around for other means of sending his passengers and cargo up the river, and in the course of a few days (neither of said river steamers having then reached St. Michaels) completed negotiations with the officers of the Rock Island Company for the use of the steamer Rock Island, and entered into the charter party upon which this litigation is based; assuming to do so on behalf of the Waterhouse Corporation. This charter party was

written in duplicate, each party retaining one of the original documents, and reads as follows:

"This indenture of charter party made and executed this fifth day of July, 1898, by and between Rock Island Alaska Mining Company, owners of the steamer Rock Island, party of the first part, and the Frank Waterhouse, Limited, of London, the party of the second part, witnesseth as follows: The party of the first part, for the considerations hereinafter mentioned, and the covenants on the part of the party of the second part to be kept and performed, does hereby lease and charter to the party of the second part that certain stern-wheel steamboat called 'Rock Island,' now lying at the port of St. Michaels, Alaska, to have, use, and operate upon the Yukon river so long as said party of the second part shall wish, not extending beyond the season of 1898. Said party of the second part shall have absolute and complete control and management of said steamer while they shall retain her, and shall provide said steamer with officers and crew for the operation thereof, with the exception of two engineers, pilot, and secretary of the Rock Island Alaska Mining Company, which party of the first part agree to provide and pay for; and, further, the party of the second part shall maintain said engineers, pilot, and secretary in like as their own crew until steamer is returned to party of the first part. Said steamer to be delivered upon demand to party of the second part alongside of the British steamship Garonne, in the harbor of St. Michaels, and upon such delivery in good condition this charter party shall begin. For the use of said steamer aforesaid, party of the second part agrees to pay the party of the first part the sum of five hundred dollars per day during the period of their use thereof, and until said steamer be delivered to the party of the first part as hereinafter provided; first payment to be made at Dawson City upon arrival of the steamer, to cover number of days consumed, and in like manner upon the arrival of steamer at St. Michaels. Said party of second part may surrender said steamer to party of the first part, and cancel and annul this charter party, at any time after expiration of one month from date of charter, by delivery of steamer Rock Island to party of the first part, either at St. Michaels or Dawson City, in like condition as received, except ordinary wear and tear. In witness whereof, the respective parties hereto have caused these presents to be signed this fifth day of July, 1898, by the Rock Island Alaska Mining Company, by its vice president and general manager, duly authorized, and the Frank Waterhouse, Limited, by C. G. Conradi, Captain S. S. Garonne, its authorized agent, on the date first above mentioned.

"The Rock Island Alaska Mining Co.,
"By Wm. C. Knaack, Gen. Mgr.,
"By H. U. Crockett, Vice President.
"Frank Waterhouse, Ltd.,
"By C. G. Conradi, Capt. S. S. Garonne.

"Attest: E. L. Kahlke, Sec'y.
"Witness: Jno. C. Hayden.
"[Corporate Seal of Rock Island Alaska Mining Co.]"

At the time the charter party was entered into, Capt. Conradi, assuming to act on behalf of the Waterhouse Corporation, also entered into an agreement with the Rock Island Company to furnish transportation on the steamer Rock Island to Forty-Mile Post, on the Yukon river, to two passengers, and for 15 tons of machinery and supplies then stored on said steamer, and to render all assistance possible with the crew of the steamer Rock Island in unloading said machinery and supplies at destination. The consideration for this transportation was the sum of $500, the receipt of which was acknowledged by Conradi in the agreement.

In accordance with the terms of the charter party, the steamer Rock Island was delivered alongside the Garonne, and receipted for by Capt. Conradi, on behalf of the Waterhouse Corporation, on July 7, 1898, at noon. Capt. Conradi also receipted in the same way for a quantity of coal then on board the Rock Island, agreeing to return an equal amount to the defendant in error upon surrender to it of the steamer. The officers and crew employed by the Waterhouse Corporation at once took possession of the Rock Island, with two

engineers, pilot, and secretary provided by the Rock Island Company, and proceeded to stow away so much of the cargo of the Garonne as the Rock Island was able to take, including a portion of the cargo owned by the Waterhouse Corporation. The loading consumed four days, at the expiration of which time the Rock Island started up the Yukon river. The steamer Rock Island No. 2, in command of the officers of the Rock Island Company, started up the river at about the same time. Considerable delays were experienced by the Rock Island through stopping at river points, cleaning boilers, and loading wood for fuel, and when about 1,300 miles from the mouth of the river she grounded on the Ft. Yukon bar. Assistance was asked of the Rock Island No. 2, which steamer spent about six days in trying to pull the Rock Island from the bar and in unloading and reloading her cargo, but finally abandoned the effort and continued up the river to her destination. Later the Rock Island was pulled off the bar by another steamer, the officer in charge of the vessel paying $1,000 for the service. After still further delays by breakage of machinery, trouble with the steam capstan in making landings, etc., she finally reached Dawson at 7:30 a. m. of August 23d. Upon the arrival of the Rock Island at Dawson, demand was at once made by the Rock Island Company for the amount due under the charter party. Capt. Jordison, in command of the Rock Island for the Waterhouse Corporation, had not the money with which to pay it, and entered into an agreement with the representative of the Rock Island Company that the money collected as freight charges should be paid into the Bank of British North America at Dawson, to the credit of H. U. Crockett, vice president of the Rock Island Company, from which should first be paid the wages due the crew, and the port and customs charges; the balance to be retained by the Rock Island Company on account of the hire of the steamer. The Waterhouse Corporation received the portion of the cargo belonging to it, and through its agent, Longmire, obtained a storeroom in Dawson, and exposed the goods for sale. The remaining cargo was delivered to the several consignees; the freight thereon collected and paid into the bank. The steamer Rock Island was then, on August 26, 1898, surrendered to the Rock Island Company; Capt. Jordison and the purser, Gilkison, giving the company a receipt acknowledging having had the steamer under charter from July 7, 1898, until August 26, 1898, at noon. A few minor transactions were subsequently had in Dawson: The Rock Island Company purchased certain goods of the Waterhouse Corporation at its store, and agreed to take a part of the equipment which had been supplied the steamer Rock Island by the Waterhouse Corporation at St. Michaels; the price to be fixed in Seattle upon arrival of the representatives of the respective parties. The Rock Island Company also transported to St. Michaels from Dawson three passengers, under agreement with Capt. Jordison, the fare charged being $50 each.

In the meantime the Garonne had returned to Vancouver. Upon her arrival there, Capt. Conradi reported the making of the charter party to Waterhouse, manager of the Waterhouse Corporation, delivering to him one of the duplicates of the document. This took place at some time between July 22d and 25th. Some eight or ten days later, on August 2d, Waterhouse wrote a letter to the Rock Island Company, stating that Capt. Conradi had exceeded his authority as master of the vessel in entering into the charter party for the steamer Rock Island, and that he had no authority, as agent of the corporation, to make such a charter; that, as manager of the corporation, he (Waterhouse) had no right to confirm the action of Capt. Conradi without referring the same to the trustees of the corporation,—and therefore gave notice that the charter party was not ratified, but that the matter was referred to the trustees for such action as they might see fit to take. Upon the return to Seattle of H. U. Crockett, vice president of the Rock Island Company, and as soon as he recovered from an illness contracted en route, he called upon Waterhouse at the Seattle office of the Waterhouse Corporation, and asked for a settlement of the account between that corporation and the Rock Island Company. Waterhouse then and there notified Crockett, as the representative of the Rock Island Company, of the intention of the Waterhouse Corporation to repudiate the charter party. Thereupon this suit was brought

by the Rock Island Company against the Waterhouse Corporation, in the circuit court of the United States for the district of Washington, for the hire of the steamer Rock Island under the charter party; for the value of the coal used on the said steamer, and not returned as per agreement; for the services of the steamer Rock Island No. 2 on the Ft. Yukon bar; and for the transportation of three passengers for the Waterhouse Corporation from Dawson to St. Michaels on the return of the Rock Island. Certain credits were allowed by the Rock Island Company for transportation of goods on the Rock Island up the Yukon, for cash received at Dawson, for goods purchased at Dawson from the Waterhouse Corporation, and for goods on board the Rock Island taken by the Rock Island Company at Dawson under agreement, which, with $500 disallowed by the court upon demurrer, left the amount claimed at the trial $20,565.19. The Waterhouse Corporation denied, in its answer, that Conradi was at any time its authorized agent for the purpose of entering into or executing the alleged charter party, or in any way authorized to enter into or execute the same in behalf of the corporation. It also denied that the steamer Rock Island, in good condition or otherwise, was delivered to the Waterhouse Corporation in St. Michaels harbor on July 7, 1898, and accepted by it, or that the Rock Island Company duly performed the contract on its part to be performed, or that the Waterhouse Corporation kept the steamer under said charter for 50 days, until August 26, 1898, and used it during that time in the transportation of freight and passengers between St. Michaels and Dawson. By way of affirmative defense, the Waterhouse Corporation, while not admitting that it entered into the charter party, or that the same was entered into or executed in its behalf by any person authorized so to do, or that it had in any way ratified or accepted said charter party, alleged that if, for any reason, it was liable to the Rock Island Company in any sum whatever upon said charter party, it was entitled to sundry abatements from the total amount of the hire of said steamer Rock Island called for by the terms of said charter party, and to sundry set-offs against the claims of the Rock Island Company, by reason of the following facts, and in the following amounts: (1) In the sum of $12,500 for 25 days' prolongation of the trip of the steamer under the charter party by reason of the steamer's unsound and bad condition, having a weak and defective capstan, and boilers and engines of weak construction, and inadequate strength and power for the exigencies of navigation upon the Yukon, with leaky steam pipes and fittings, and not having the necessary equipment of ringbolts, spars, and stout cables for use in getting afloat when grounded on sand bars or shoals, all contrary to representations alleged to have been made by the officers of the Rock Island Company, and for other reasons (not, however, supported by any proof); (2) in the sum of $7,610.60 for expenses of operating the steamer, and maintaining its crew and passengers thereon, during said 25 days' unnecessary prolongation of her trip; (3) in the sum of $1,000 for extra expense in getting the said steamer towed off by a passing steamer from a shoal in the Yukon river, on which she was grounded in the course of the said trip,—this expense necessitated by reason of the disregarding of a verbal agreement by the Rock Island Company, alleged to have been made between it and the persons representing the Waterhouse Corporation when said charter party was entered into, to the effect that the chartered steamer and the steamer Rock Island No. 2 should render mutual assistance, without charge, in getting each other afloat in case either of them grounded; (4) in the sum of $478 for damage to merchandise of the Waterhouse Corporation forming a part of the cargo of said steamer, by reason of steam escaping from leaky pipes and fittings into the hold where the merchandise was stowed, wetting and otherwise injuring it.

Bogle & Richardson and Burke, Shepard & McGilvra, for plaintiffs in error.

Harold Preston, E. M. Carr, and L. C. Gilman, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The appellee has interposed a motion to strike from the record the document purporting to be a bill of exceptions, appearing therein, on the ground that it does not constitute a proper, sufficient, or legal bill of exceptions. The appellee also objects to the consideration by the court of the alleged errors assigned by the appellant, on the ground that no proper, sufficient, or legal assignment of errors was filed in the circuit court, and no proper, legal, or sufficient assignment of errors appears in the record. The bill of exceptions covers 156 pages of the printed record. It contains the usual formal introductory matter, and then follows a transcript of the testimony of witnesses in narrative form, with the objections by counsel to the admission of testimony, and the rulings of the court with respect to such objections; a report in full of the charge of the court to the jury; the exceptions taken by counsel to certain portions of the charge, and to the refusal of the court to give certain instructions requested; and the exhibits in the case, including, also, the proceedings on a motion for a new trial. The certificate of the trial judge to this bill of exceptions recites that in "order that all the motions, offers, rulings, exceptions, and other proceedings had, and all the testimony, exhibits, and other evidence adduced, received, or offered, in said cause, and not already a part of the record, may be by this bill of exceptions made a part of the record therein," the judge has set his hand and seal to the same, and certifies that the bill of exceptions, together with the sundry exhibits therein mentioned, "contains all the motions, offers, rulings, exceptions, and other proceedings had, and all the material testimony exhibits, and other evidence adduced, received, or offered, in said cause, from the beginning of said cause down to the date of this certificate, and contains all the material facts, matters, and proceedings in said cause not already a part of the record therein, including the charge of said judge to said jury in full." The record thus made up appears to be a report of the trial of the case in such fullness of detail as to incumber the record with much useless matter, and impose upon this court the difficult task of determining the precise relation of scattered testimony to the principles of law declared by the court in the instructions given to the jury, and to the propositions of law contended for by counsel, and rejected by the circuit court in the instructions refused. This method of presenting a case to the appellate court has been repeatedly condemned by the supreme court of the United States. Insurance Co. v. Raddin, 120 U. S. 183, 193, 7 Sup. Ct. 500; Hanna v. Maas, 122 U. S. 24, 26, 7 Sup. Ct. 1055.

The assignments of error are 32 in number, 11 of which relate to exceptions taken by the appellant to the action of the court in admitting certain testimony offered by the appellee; 2 to the refusal of the court to admit testimony offered by the appellant; 2 to the denial of motions made by the appellant, one of which was the denial of a motion for a new trial; 9 to instructions given by

the court to the jury; and 8 to the refusal of the court to give instructions requested by the appellant.

In the view we take of this case, there are but few questions properly presented by the record for our consideration. The first and controlling question to be determined is as to the validity of the charter party executed at St. Michaels, Alaska, on July 5, 1898, on the part of the Rock Island Alaska Mining Company, by W. C. Knaack, general manager, and on the part of Frank Waterhouse, Limited, by C. G. Conradi, captain of the steamship Garonne, for the lease and charter of the steamboat Rock Island, to operate on the Yukon river between St. Michaels and Dawson City during the season of 1898. Was this charter party, under the circumstances connected with its execution, a lawful contract, binding upon the appellant?

The first objection urged against it by the appellant is that it was incompetent evidence, by reason of the fact that it did not have affixed to it an internal revenue stamp, as required by the act of June 13, 1898 (30 Stat. 448, 460), commonly known as the "War Revenue Law." Schedule A of this act went into effect on July 1, 1898; but it is a well-known fact that the government was not prepared at that date to supply the public with internal revenue stamps throughout the United States, and particularly was this failure an established fact of general public notoriety in the distant territory of Alaska. It is true, however, that this condition of affairs did not relieve the parties interested in the charter party from the duty of having it subsequently stamped as provided by law, if they desired to use the document as an instrument of evidence. But the ruling of the court in admitting the charter party in evidence without being properly stamped, though erroneous, was without prejudice in this case. The language of section 14 of the act of June 13, 1898, is:

"That hereafter, no instrument, paper, or document required by law to be stamped, which has been signed or issued without being duly stamped, or with a deficient stamp, nor any copy thereof, shall be recorded or admitted, or used as evidence in any court until a legal stamp or stamps, denoting the amount of tax, shall have been affixed thereto, as prescribed by law."

The original contract is unaffected by this statute, and, if otherwise valid, it remains valid, notwithstanding the absence of a stamp, from the written evidence of its terms. The charter party was set out in full in the complaint. The answer of the defendant (appellant here) denies the allegations of the paragraphs of the complaint containing the charter party, but immediately qualifies the denial by alleging that Conradi, who executed the charter party, was not at the time of the execution of the instrument, or at any time, the authorized agent of the defendant for the purpose of entering into or executing the instrument; and, as an affirmative defense, defendant alleges that "if, for any reason, it is liable to the plaintiff in any sum whatever upon said charter party," it is entitled to sundry abatements from the total amount of the hire of said steamer Rock Island called for by the terms of said charter party, "and to sundry set-offs against the plaintiff's claim.

for said total amount, by reason of the following facts." The defendant then proceeds to allege and set up certain counterclaims as a set-off against the amount claimed by the plaintiff under the charter party. The questions placed in issue by the answer were: (1) Was Conradi the authorized agent of the defendant in executing the contract of charter party? (2) If so, what counterclaims was the defendant entitled to have allowed, as against plaintiff's claim for the hire of the vessel under the terms of the contract? The validity of the contract was only in issue with respect to Conradi's agency, and that was a question of authority, to be determined by facts outside of the document itself. The written evidence of the contract was not, therefore, necessary to establish plaintiff's case upon this issue. The ruling of the court was accordingly without prejudice to any right of the appellant involved in any question submitted to the court for determination.

It is next contended by the appellant that there is no general power vested in the master of a ship to bind the owner of a ship or cargo beyond the limits of the ship's own voyage, by chartering another vessel to perform the connecting transportation; and, further, that no such power arises, whatever the necessities or emergencies of the situation, in case of the failure of expected means of performing the connecting transportation to complete through contracts made by the owner. Undoubtedly the main duty resting upon the master of a vessel is to take his ship safely to its destination, and thus accomplish the purpose of the voyage. This purpose in the case at bar was the earning of carriage money. It is well settled that, if an exigency arises on the high seas which threatens to interfere with the success of such an undertaking, the master is clothed with authority to act as the agent of the shipowner and shipper. This rule, it would seem, should apply to any emergency occurring while the responsibility of the master continues, and the authorities are to the effect that this responsibility extends to the delivery of the cargo. In 1 Pars. Ship. & Adm. 233, the duty of a master is extended to transshipment of the cargo, when unable to transport the goods to their port of destination himself. The supreme court of the United States expresses the same opinion in The Maggie Hammond, 9 Wall. 458, and further says:

"Shipments are made that the goods may be transported to the place of delivery, and the master should always bear in mind that it is his duty to accomplish that object."

The early authority on maritime law, Emerigon, specifically declares, with reference to the agency of a captain of a ship:

"His quality of captain makes him master, and confers upon him the care of all that which concerns the ship and the cargo."

He further states it as a general rule that the owner is bound by the acts of the master.

The case of Lemont v. Lord, 52 Me. 365, cited by counsel for each of the parties herein, is in point; and, while it deals largely with the question of the master's agency for the shipper, the court also

considers generally the powers and duties of the master of a ship in an emergency. It declares the American law to be that stated by Chancellor Kent in his Commentaries, as follows:

"In this country we have followed the doctrine of Emerigon, and the spirit of the English cases, and hold it to be the duty of the master, from his character of agent of the owners of the cargo, which is cast upon him from the necessity of the case, to act in the port of necessity for the best interest of all concerned; and he has powers and discretion adequate to the trust, and requisite for the safe delivery of the cargo at the port of destination. If there be another vessel in the same or in a contiguous port, which can be had, the duty is clear and imperative upon the master to hire it; but still he is to exercise a sound discretion, adapted to the case."

And, after citing other authorities, the court says:

"When a master stands upon the deck of his ship, as he sails out of his port of departure, he is primarily, and as he then stands, the representative and agent of the owners of the ship. If his voyage is prosperous and free from disaster, he has no right, as we have seen, to intermeddle with the cargo on the voyage, or on its safe termination. But he has, so to speak, within himself a latent potentiality, existing in possibility and not in act, of other and distinct powers and agencies, which subsequent events may call into exercise. From a simple captain of the ship, and of that alone, he may, in case of disaster, peril, or stress of weather, become an absolute master over the cargo. He may cast it overboard, if the safety of the vessel requires the sacrifice. He may, in case of absolute necessity, sell a part of the cargo. He may, when not forbidden by a positive statute of his country, ransom both ship and cargo. He may be, as he often is, placed in such circumstances that he is, from necessity, chiefly by reason of the absence of all other parties, the agent of each and all persons interested in the vessel, the cargo, the freight, and the insurance."

And again:

"When a master finds himself in this position of responsibility, and called upon to act, he is to remember that the owners of his ship will lose all their freight, if the goods are not forwarded, and that he, on their behalf, as master, has a right to retain possession, for the purpose of transshipping in order to earn the original freight, or a part at least. Mason v. Lickbarrow, 1 H. Bl. 359. If this can be done, it answers all the purposes of the original contract, so far as the principal object of the voyage is concerned. If, then, the master can find in the port, or in one within a reasonable distance, another ship, the master of which will agree to carry on the cargo at a rate at which something may be saved to the owners of the ship out of both freights, it would be his right and his duty to employ the new ship, for the benefit of his owners, and acting on their behalf; for, although there is no legal obligation under the original contract, yet the owners of the vessel may, if they find it for their interest, forward the cargo in another vessel. It is therefore the right and duty of the master to make all reasonable efforts to obtain another vessel, on such terms as will eventually save something to the owners of the ship. Hugg v. Insurance Co., 7 How. 595. In doing this, he acts as master of the vessel, still having in his possession the cargo for the owners of the ship, and has not any occasion, nor is there any necessity for him, to assume the character of supercargo or agent for the merchant. This latent and dormant office still remains in abeyance."

Are these principles of law applicable to the case at bar? In addition to the facts contained in the record, the court is justified in judicially knowing the current history of the times, and the fact that the transactions in this case took place at the time of, and were connected with, the extraordinary rush of adventurers to the newly-discovered gold fields on the Yukon river, popularly known as the "Klondike." The situation presented emergencies to those en-

gaged in transportation, which had to be met promptly, and with due regard to all the attending circumstances. It appears that Conradi, as master of the ship Garonne, was employed by the appellant; that said ship arrived at St. Michaels, Alaska, on July 4, 1898, with passengers and a cargo bound for and consigned to Dawson and other Yukon river points; that arrangements had been made by the Waterhouse Corporation to transport the passengers and freight of the Garonne from St. Michaels to their respective destinations by a river steamer to be furnished by F. W., Limited, a corporation having the same American manager as the Waterhouse Corporation; and that upon the arrival of the Garonne at St. Michaels the river steamer did not appear. It further appears that Capt. Conradi was confronted with the alternative of returning to Vancouver with passengers and freight, thereby losing to the Waterhouse Corporation the entire earnings of the trip, as well as subjecting it to liability for breaches of contract, or of providing other means of transportation for said passengers and freight; there being no conveniences at St. Michaels for caring for either on shore. Conradi, as master of the ship, was the only person in a position to look after the interests of all parties concerned. It was clearly not only within the scope of his employment, but his duty, in the emergency, to do that which the owner would do for himself if personally present. The situation required action upon his part in order to carry out his employer's contracts, and it is plain that the duty rested upon him, as master, to make any reasonable arrangement to that end. This duty vested in him a power equal to the emergency and suitable to the occasion. It is not contended that the terms of the contract which he entered into under these circumstances were unreasonable. It may be observed, also, that the evidence shows the total freight and passenger earnings of the expedition, from shippers other than the Waterhouse Corporation, to have exceeded the total sum due under the charter party. It follows that there was evidence sufficient to establish the fact that Capt. Conradi was, under the circumstances, authorized to make the charter party; that the instrument was a lawful contract between the parties, and binding upon the appellant. Questions of this nature are to a large degree dependent for their solution upon the facts and circumstances of the case, and in a common-law court are properly submitted to the consideration of a jury, with suitable instructions as to the law of the case; and this is what the court did with respect to this contract of charter party. The same observations are applicable to the other agreements entered into between the parties.

Error is assigned upon the court's instruction with regard to the ratification of the charter party by the appellant, and upon the exclusion of certain evidence relative thereto. It having been determined, however, that there was evidence sufficient to establish the fact that Capt. Conradi had the power, under the circumstances, to make the charter party, the question of ratification becomes immaterial.

It is next contended by appellant that the Rock Island was not in a fit and proper condition for navigation of the Yukon at the time

the steamboat was chartered, and that by reason thereof delays were caused in the trip up the river which entailed an extra expense to said appellant of about $8,600, and an addition to the amount which would otherwise have been due to the appellee under the charter party of $12,500; and error is assigned upon the instructions of the court to the jury to disregard the claim of appellant for right of deduction, so far as it related to the absence of certain appliances from the Rock Island, and the working of the capstan, if the jury believed that the representatives of the appellant accepted the steamer in the condition in which she was when they took her, and that, in order to entitle the appellant to deduction on account of delays from machinery breakages or defective capstan, the same must have arisen from inherent defects unknown to the appellant, or which subsequently arose through incompetency of the engineers. Error is also assigned upon the refusal of the court to instruct the jury that the owner of a vessel is answerable for any defects, whether known or unknown, visible or patent, which impair her usefulness to the hirer. The following statement appears in the bill of exceptions with respect to the condition of the steamer Rock Island immediately preceding the charter, and the cause of her grounding in the Yukon river:

"The undisputed evidence in the case showed that, before taking the steamer Rock Island at St. Michaels harbor, Capt. Conradi and Capt. Jordison made an examination of the boat and of her machinery and appliances, and discovered the full details of her equipment, and the absence of spars, ringbolts, and tackle therefor. There was also evidence introduced by the plaintiff on rebuttal tending to show that the capstan of the steamer Rock Island was a new machine, of a standard manufacture, and was in good working order at the time the steamer was accepted by Captain Conradi and Captain Jordison for the defendant. The undisputed evidence showed that the grounding of steamers was an ordinary mishap or peril of navigation of the Yukon river."

There is no evidence that the representatives of the appellant made any demand upon the appellee for any further appliances than were then upon the boat, nor that they complained of their absence. And, after accepting the boat with the knowledge of such absence, appellant could not afterwards complain of it. We find no error in the court's instruction in this regard, or upon the question of inherent defects in machinery. It is well established that there is an implied warranty by a shipowner that the vessel he furnishes to another party shall be reasonably fit for the purposes of the contemplated voyage at the time he delivers her to the hirer, and that the owner is responsible for damage caused by latent defects existing at the time of hiring. And the court so stated the law to the jury.

Appellant lays considerable stress upon the alleged error of the court in admitting in evidence the subpœna requiring the attendance of Capt. Conradi, with the marshal's return thereon showing inability to serve the same, and in instructing the jury that they had the right to infer that Conradi would have given testimony which would not be more favorable to appellant than the testimony given by the other witnesses, if they determined as a fact that appellant facilitated the absence of Conradi from the trial by grant-

ing him leave of absence. The facts connected with the making of the charter party in suit were particularly within the knowledge of Capt. Conradi, and the presumption would ordinarily arise that the appellant had it in its power to show those facts by producing him as a witness. As stated in Railway Co. v. Ellis, 4 C. C. A. 454, 54 Fed. 481:

"It is a well-settled rule of evidence that when the circumstances in proof tend to fix a liability on a party who has it in his power to offer evidence of all the facts as they existed, and rebut the inferences which the circumstances in proof tend to establish, and he fails to offer such proof, the natural conclusion is that the proof, if produced, instead of rebutting, would support, the inferences against him, and the jury is justified in acting upon that conclusion. 'It is certainly a maxim,' said Lord Mansfield, 'that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other side to have contradicted.' Blatch v. Archer, Cowp. 63, 65,"—citing, also, 1 Stark. Ev. p. 54.

See, also, Clifton v. U. S., 4 How. 242; Frick v. Barbour, 64 Pa. St. 120.

This rule applies even in criminal cases (Graves v. U. S., 150 U. S. 118, 14 Sup. Ct. 40; People v. Hovey, 92 N. Y. 554; Rice v. Com., 102 Pa. St. 408), and justified the court's action on the trial below.

The overruling of a motion for a new trial is not assignable as error, under the practice established in the courts of the United States. This has been repeatedly held by the supreme court and by the circuit court of appeals. Moore v. U. S., 150 U. S. 57, 14 Sup. Ct. 26; Holder v. U. S., 150 U. S. 91, 14 Sup. Ct. 10; Blitz v. U. S., 153 U. S. 308, 14 Sup. Ct. 924; Wheeler v. U. S., 159 U. S. 523, 524, 16 Sup. Ct. 93; Sigafus v. Porter, 51 U. S. App. 693, 28 C. C. A. 443, 84 Fed. 430; Railway Co. v. Charless, 7 U. S. App. 359, 2 C. C. A. 380, 51 Fed. 562.

We are satisfied that no errors were committed which would justify a retrial. The judgment of the circuit court is therefore affirmed.