THE PROGRESO.

(District Court, D. Washington, N. D. July 3, 1900.)

SHIPPING—BREACH OF CHARTER—DEFAULT OF CHARTERER.

A steamship company organized for the purpose of doing a transportation business between Seattle and Alaskan points chartered a steamship for two trips between Seattle and St. Michaels. She was loaded with passengers, a large number of whom were sold tickets through to Dawson, and a cargo, much of which was contracted to be delivered at the same place. The company sent an agent on the vessel, but, as its officers knew,

he was without sufficient funds to carry out its contracts from St. Michaels, and the company was insolvent and without credit. On reaching St. Michaels the military authorities refused to allow the landing of the passengers until arrangements were made to forward them to their destination. In this emergency the captain took charge of affairs, compelled the company's agent, by threats of criminal prosecution, to turn over all claims for freight, took possession of the company's supplies, and certain coal and merchandise which had been purchased by the company, but not paid for, and shipped on the vessel, and paid for the same to the vendors. By the funds and supplies so secured, and the money received from passengers for the return trip, and by pledging his vessel for the deficiency, he secured passage for his passengers to their destination, and was enabled, after a considerable delay, to discharge his vessel. *Held*, that as the vessel was bound, not only to carry her passengers and cargo, but to discharge them at the end of the voyage, the failure of the charterer to provide for the same was a breach of the charter, which justified the captain in the action taken by him, and gave the charterer no cause of action against the owners, beyond requiring an accounting, and that the owners were entitled to recover the excess of the cost of fulfilling the charterer's transportation contracts over the amounts realized by the captain: such expense being necessary to enable the vessel to discharge, and to fulfill her own obligations.

2 SAME--CONTRACTS WITH PASSENGERS.
The tickets sold passengers from Seattle to Dawson contained a provision by which the purchaser waived the right to hold the vessel or charterer responsible for any damage sustained by their failure to forward him to his destination, unless resulting from the actual negligence or incompetency of the carrier, and providing that if he could not, for any reason, be safely landed at the port of destination, he might be landed at the next port at which such landing could be safely made. *Held*, that such provision contemplated only a case of necessity arising otherwise than by default of the carrier, and could not be invoked by the charterer as requiring the captain of the vessel to land his passengers at some other port than St. Michaels, where there were no military authorities to interfere, and where they would be left unprovided for, in violation of their contracts.

This is a suit in rem against the steamship Progreso to recover damages for breach of a contract by which her owners chartered said steamship to the Seattle & Yukon Steamship Company for two voyages between Seattle and St. Michaels, with an option for two other voyages between the same ports. The master and owner defend on the ground that the charter party was broken by the charterer, and have also filed a cross libel, claiming damages alleged to have been caused by the failure of the charterer to perform said contract on its part. Hearing on the merits. Decree for cross libelant.

Donworth & Howe, for libelant.
Ballinger, Ronald & Battle, for interveners.
Metcalfe & Jurey, for claimant and cross libelant.

HANFORD, District Judge. The libelant, in his capacity as receiver of the Seattle & Yukon Steamship Company, an insolvent corporation, commenced this suit to recover damages for losses to said corporation alleged to have been caused by the breach of a contract by which the steamship Progreso was chartered for the purpose of carrying passengers and freight between Seattle and St. Michaels during the season of 1898. The firm of D. R. Campbell & Sons have come into the case as interveners, on the ground that, by virtue of an assignment of the charter party made to them as security for

money loaned to the Seattle & Yukon Steamship Company, they are entitled to any damages which may be recoverable. It is admitted that the charterer paid to the owners of the steamship the full amount of money stipulated to be paid for the first voyage, and that the steamer was dispatched to St. Michaels with passengers and freight taken on board at Seattle, Vancouver, and Victoria. The owners defend on the ground that the Seattle & Yukon Steamship Company made contracts with passengers and shippers for through transportation from Seattle, Vancouver, and Victoria, via St. Michaels, to Dawson City and other points on the Yukon river, and failed to make adequate arrangements for carrying the passengers and freight beyond St. Michaels, and when the Progreso arrived at St. Michaels the landing of her passengers and freight was not permitted until arrangements were made for carrying them up the river, so that the ship was detained an unreasonable time at St. Michaels, and her master was compelled to incur very heavy expenses. The court has had a wearisome task, in having to digest over 2,000 typewritten pages of testimony and a quantity of documents submitted as evidence, presenting a vast amount of details, with most tedious repetitions and reiterations; but, after all, the case must be determined upon a few important and salient facts, which are as follows: The Seattle & Yukon Steamship Company attempted to do a large and lucrative business without capital other than its pretentious name, the energy of its promoters, and $70,000 borrowed from a manufacturing firm in the state of Maine. The Progreso was chartered to run from Seattle to St. Michaels, and a contract was made with a shipbuilding firm in Seattle to sell to the company three river steamboats which were being built at Seattle, and were to be delivered at St. Michaels. These boats were partly paid for, and the balance of the purchase price, $68,000, was to be paid on delivery. With these facilities and preparations, the company commenced advertising and soliciting business, and passenger tickets were sold, without any regard to fixed rates, to about 240 fortune seekers, 157 of whom paid for through transportation, via St. Michaels, to Dawson City, and other points along the Yukon river; and about 1,000 tons of freight was received, more than half of which was for delivery at Dawson City. The money borrowed from the interveners and collected from passengers was mostly expended in making partial payments for the river boats, in fitting, equipping, and supplying the Progreso for her first trip, and for the general expenses of the company. When the steamer was dispatched, she had on board 250 tons of coal, which the company had bought as a cash purchase, but for which no payment was made, and several other lots of merchandise of which the company obtained possession without making payment. A comparatively small amount of freight was to be collected at St. Michaels, part of it was payable at Victoria or Vancouver upon the return of certificates showing delivery of the goods at Dawson City, and a considerable part of it was payable only from proceeds of the cargo after it had been sold. Mr. Grayson, as an agent of the company, was sent on the Progreso, with about $5,000 in money, and drafts to the amount of $35,000 drawn upon the auditor of the insolvent company, who had been previously sent to

the Yukon river with a quantity of merchandise for sale, the value of which I have not been able to ascertain from the evidence. This agent and the officers of the company knew at the time of his departure that with the means at his command he could not make payment for the river boats, and they had no expectation of securing them. It was necessary to persuade the builders to deliver one or more of the boats unpaid for, or else raise sufficient money by collections of freight and by the sale of tickets for return passage from St. Michaels to Seattle to cover the expenses of landing the passengers and cargo, and forwarding the same up the river, or else the company must necessarily fail to perform its contracts for transportation of passengers and freight to points beyond St. Michaels. The passengers could not be landed and abandoned at that inhospitable place, because the United States military officers there would not permit vessels to discharge passengers for whom no provisions had been made for habitations or for transportation to their places of destination. The managing officers of the company had no right to expect that Mr. Grayson would be able to make any terms at St. Michaels with the boat builders to get possession of all or either of the river boats contracted for, because the general manager of the company had been distinctly warned by the shipbuilding company that payment as stipulated in the contract, at the time of delivery of the boats, would be exacted. See Campbell v. Moran Bros. Co., 38 C. C. A. 293, 97 Fed. 477. The evidence convinces me that failure to perform the company's contracts with its passengers and shippers was the only possible outcome of the venture. The general manager of the company knew before the ship left Victoria that the company had failed to make adequate provisions for fulfilling its passenger and freight contracts, and that it was unable to do so. Soon after leaving Victoria the passengers became suspicious, and during the run northward there was continual discussion among them, and threatening demonstrations were made towards Mr. Grayson, who realized that, as the representative of the defaulting company, he was the object of their wrath, and that he would probably be lynched at St. Michaels unless he could in some way elude these victims of misplaced confidence. As was natural under the circumstances, he hastened to get ashore on arrival at St. Michaels, and immediately arranged to return to Seattle on the first vessel to depart. Capt. Gilboy, commander of the Progreso, was prompt and resolute in grasping the situation. Before arrival at St. Michaels he informed Grayson that the company's charter would be terminated as soon as the Progreso anchored at St. Michaels, and on the day of her arrival he caused the arrest of Grayson, and, by threatening him with a criminal prosecution, compelled him to execute an assignment of all the supplies and property belonging to the company which was then in the Progreso, and the freight bills. After securing all that Grayson had to turn over, except the cash, the captain made his own arrangements for getting the passengers and cargo landed and forwarded up the Yukon river. He was obliged to deal with a clear case of necessity. The passengers had to be carried up the river, for the reason that there was no other way to get them out of the ship and free her so she could return;

and the captain was the only person at the place authorized to hypothecate the ship, which was the principal available resource. He had to secure a river boat, and purchase fuel and provisions necessary for the trip, and for boarding the passengers and crew during the time of their necessary detention. He purchased the three river boats, which had been contracted to the company, for the price of $68,000. One was immediately resold for $30,000 cash; another was resold for $30,000, to be paid for on her arrival at Dawson; leaving $8,000 to be raised, somehow, to pay for the third boat, which was used to carry these passengers up the river. He also bought the 250 tons of coal which was delivered on board the Progreso at Seattle without being paid for. Some money was raised by selling tickets for passage on the Progreso on her return trip to Seattle, and some of the owners of freight, who had made contracts for transportation at a very low rate, were induced to give some aid by paying a reasonable price for getting their freight up the river. After making the best arrangements possible with all the people concerned, the captain was obliged to, and did, hypothecate the Progreso for the amount of the purchase price of these river boats, after deducting the cash payment of $30,000. The charter party is vague and uncertain in some of its terms, and in consequence of its ambiguity there is a serious dispute between the parties as to whether the ship was chartered for a round trip from Seattle to St. Michaels and return, so that the charterer became entitled to the earnings of the vessel on the return part of the voyage, or only to the passage money and freight for the trip going north. On this point I hold that the charterer paid a liberal price for the round trip, and, according to the reason and justice of the case, the charter party must be construed, according to the intent of the parties, as a contract for a round trip. In the argument, stress is laid upon one clause of the charter party, specifying that at the expiration of the lay days at St. Michaels, stipulated for, the ship was to be delivered to her owners for return to Seattle. This, however, is unimportant, because it is absolutely meaningless. None of the parties contemplated that there was to be any change of possession of the vessel at St. Michaels, and redelivery there was impossible, for the reason that the owners did not go to St. Michaels to receive her. There could be no delivery to the captain, as agent of the owners, for the reason that the captain and crew were the employés of the owners throughout the entire voyage, and from the beginning the vessel was in the possession of her owners as completely as she could be, by reason of being under command of her captain.

The foregoing recital contains my findings and decision in this case as to the facts, and I have decided the disputed question as to the construction of the contract in favor of the libelant,—that is to say, I hold that the charter party entitled the charterer, upon the terms and conditions stated therein, to the use of the vessel for a round trip from Seattle to St. Michaels and return; and the important question next to be considered is, did the charterer sustain any injury, for which damages may be awarded, by a breach of the contract? In order to reach a correct determination of this question, it is necessary to keep in mind the important consideration that

by loading and dispatching the Progreso the charterer, in effect, pledged her to the fulfillment of each contract made with passengers and shippers,—at least, for their safe transportation to St. Michaels; and this contract was not fulfilled, so as to clear the ship of liens in favor of passengers and shippers, by carrying them to the place of anchorage near St. Michaels. The master of the ship could not then place a gang plank over the rail, and require the passengers to walk to the end of it and drop into the sea, after the manner of pirates in dealing with captives; nor could he bring them back to Seattle, or land them at Dutch Harbor, as counsel have contended he might have done, without subjecting the vessel to liability for heavy damages. There is therefore in the charter party an implied agreement that the charterer would act in good faith, and make adequate provisions for landing the passengers and discharging cargo on the arrival of the ship at St. Michaels; and it is my opinion that a failure on the part of the charterer to make such provisions constitutes a breach of contract, and that the contract was broken by the charterer, in sending the ship on her voyage, laden as she was, without having made provisions or having the ability to unlade at St. Michaels. Counsel for the libelants and interveners have labored hard in attempting to show that the passenger contracts contained in the tickets which were sold do not entitle the passengers to be landed at St. Michaels, although they paid for a through passage from Seattle, via St. Michaels and the Yukon river, to Dawson. The argument is based upon stipulations printed upon each ticket as follows:

"The purchaser waives the right to hold said vessel, its owners or charterers, responsible for any damage or loss sustained by their failure to forward him to his destination, unless such failure results from the actual carelessness, negligence, or incompetency of the carrier. * * * If the purchaser of this ticket cannot, for any reason, be safely landed at port of destination upon arrival of vessel thereat, he may be landed at the next port reached by the vessel upon her then voyage, at which such landing can be safely made."

The contention is that, under this clause, if the military authorities at St. Michaels interposed their authority for the protection of the passengers by preventing the ship from putting them ashore and abandoning them at that place, the master could lawfully proceed to the nearest convenient place where the power of the government would not be exerted, and there put his passengers ashore, and leave them in the wilderness, unprovided for. This clause of the contract, however, cannot be construed as giving the carrier any such right. It only relates to cases of necessity, and that means necessity created by some cause other than a default of the carrier; and no right to land them at a place other than St. Michaels could arise until every available means of fulfilling the contracts had been exhausted. The necessity of the case, resulting from the insolvency and incompetency of the Seattle & Yukon Steamship Company, imposed upon Capt. Gilboy the duty, and clothed him with authority, to provide means for landing them and boarding them while they were detained at St. Michaels, and meeting the expense of their transportation up the river. Frank Waterhouse v. Rock Island Alaska Min. Co., 38 C. C. A. 281, 97 Fed. 466. The return of the ship to Dutch Harbor or Seattle without discharging her passengers and freight would not

have been an advantage or benefit to the charterer. By such proceeding the opportunity to use the ship for carrying other passengers and cargo would have been lost. Now, the measure of damages for breaking the contract, if it was broken by the owners, is the loss which the charterer sustained by reason of the breach,—in other words, the value of the use of the ship on her return trip; and it is a very plain proposition that the use of the ship could be of no value to the charterer unless her north-bound passengers and freight could be discharged at St. Michaels, and the entire loss for which the charterer has any ground for claiming compensation is due entirely to its own failure to make provisions for unlading the ship at St. Michaels. The acts and conduct of the captain and owners of the ship, of which complaint is made, do not constitute a breach of the contract with the charterer, because not effective to deprive the charterer of any right. It is true that Capt. Gilboy was in error in assuming that the charter was terminated when the ship came to anchor at St. Michaels, but his mere assertion of that claim was not the reason for, nor the cause of, the failure of the charterer to discharge the ship and reload her for the return. On the contrary, it was the lack of preparation and the incompetency of the charterer to take care of the passengers and cargo which justified Capt. Gilboy in assuming control of the enterprise, and in serving notice upon Grayson that he considered the ship to be no longer in the service of the charterer. It may also be conceded that Capt. Gilboy's conduct was unfair and harsh towards Grayson, in causing his arrest and threatening him with a criminal prosecution; but that was not a cause of any loss to the libelant, for it all took place after Grayson had ascertained that the drafts for $35,000 in his possession could not be cashed at St. Michaels, and when, being conscious of his unpleasant situation, he had abandoned his trust and had completed arrangements for his immediate return to Seattle. In view of all the facts, whatever was wrong in the means adopted by Capt. Gilboy to secure what was available for the benefit of the passengers and shippers, to whom the charterer was obligated, is insignificant, as compared with the greater wrong of the company in sending a shipload of passengers and a valuable cargo to such a place as St. Michaels, with a deliberate intention to dump them on the beach and abandon them there, after taking money for carrying them through to their several places of destination. In this suit the libelant stands in the place of the party responsible for putting Capt. Gilboy in a situation in which he was compelled by necessity to use the provisions and materials which were accessible, and he is precluded by the wrongful conduct of that party from recovering compensation for the minor offenses of the captain.

There is no evidence as to the value of the use of the ship on the return trip from St. Michaels, to Seattle, except the inference which may be drawn from the proof as to the price paid for the round trip, and as to the amount which the ship actually did earn. The most liberal estimate of the value which can possibly be made, based upon this evidence, is the amount of the gross receipts for the return trip. As this amount was absorbed in paying the necessary expenses of carrying out the passengers' contracts, which Capt. Gilboy was oblig-

ed to do in order to free the ship, it follows that there is no damage recoverable by the libelant on this account, even if the contract was broken by the owners. I have in fact given the libelant the benefit of the gross receipts for the return trip, in disposing of the cross libel, by allowing said amount to stand as a credit in favor of the charterer, to diminish the damages recoverable by the cross libelant.

The libelant's claim for the value at St. Michaels of the 250 tons of coal, and for the value of the stores and provisions appropriated by Capt. Gilboy, is without foundation in law or justice. The insolvent corporation never owned the coal, because it never paid anything for it, and the arrangements that were made for carrying an agent of the vendor to St. Michaels had the effect, as the parties intended, to continue the vendor's control and right of property in the coal until it was paid for; and the failure of the company to pay for the coal at St. Michaels justified the agent of the owners in rescinding the contract, and selling the coal, as he did, to Capt. Gilboy for cash. The provisions charged for were necessary for feeding the passengers, according to the contracts of the company to carry them to their points of destination and feed them while en route. I give no effect to the assignment executed under duress. Independently of that document, necessity imposed upon the captain a duty to feed the passengers, and he was fully authorized by law to use the supplies in the ship for that purpose. Besides the coal, there was other merchandise on board the Progreso which had been bought by the Seattle & Yukon Steamship Company and not paid for, and which Capt. Gilboy disposed of. He or the owners have been required to account to the vendors, and, having acted in good faith in the matter, I consider that they are not legally liable to the libelant. The vendors were the true owners. They had the right, on account of the insolvency of the Seattle & Yukon Steamship Company, to reclaim the goods or the proceeds after the same had been sold. Capt. Gilboy had a right to treat the goods as abandoned by the Seattle & Yukon Steamship Company, and to sell the same for the best price obtainable, for the benefit of the true owners. Having done so, and having settled with the vendors to their satisfaction, neither he nor his employers can be held liable for any profits which the Seattle & Yukon Steamship Company might have made if it had been competent to finish what was undertaken. Merchandise and property other than provisions which Capt. Gilboy disposed of for money, and which were owned by the Seattle & Yukon Steamship Company, must be allowed for; and I have credited the value thereof, as shown by the evidence, against the cross libelant's counterclaim. I also reduce the counterclaim by crediting $1,050 on account of cash advanced by the charterer for wages of the crew, and the further sum of $310 admitted to be a legal claim of the charterer for boarding the officers and crew of the Progreso on the voyage. Other items allowed to reduce the counterclaim include the gross receipts for passengers carried on the Progreso on her return trip, for freight and passengers carried on the river steamer going up to Dawson, and for passengers on the return trip of the river boat to St. Michaels. As the Seattle & Yukon Steamship Company is hopelessly insolvent, the amount of any judgment in favor of the cross libelant in this suit

will be of only nominal value, and for that reason it is useless for the court to bestow the amount of labor upon the mass of testimony in this case necessary to make a fine adjustment of accounts. It is sufficient to say that I find from the evidence that the total amount of money which came into the hands of Capt. Gilboy, and freight bills which were collected or which may yet be collected, and the value of the property which the Seattle & Yukon Steamship Company owned, other than provisions used in feeding the passengers and crew, and money advanced to pay the crew, and the indebtedness of the ship to the charterer for board of the officers and crew, does not exceed $34,000.

The cross libelant claims, as part of its damages recoverable in this suit, the cost of carrying the Progreso's passengers from St. Michaels to their points of destination up the river, calculated at the prevailing rates chargeable for passage on other steamers at the time; but as Capt. Gilboy did not send his passengers forward on steamers operated by other carriers, nor pay the rates charged in the cross libel, the court rejects that basis of estimating the damages. The testimony shows, however, that Capt. Gilboy and his employers did actually expend money and incur liabilities for discharging the Progreso at St. Michaels, for supplying and fitting her for her return trip, for supplying and furnishing the river boat to carry freight and passengers up the river, and for operating the boat to Dawson and return to St. Michaels, and for returning her crew to Seattle, which was a necessary expense, and for other necessary incidental expenses, including the cost of feeding the passengers and crew while detained at St. Michaels,—a total amount of over $28,000. To this amount should be added, as part of the damages recoverable by the cross libelant, the reasonable value of the services of Capt. Gilboy, and of Mr. Griffith and Mr. Corey, whom he employed to assist him, as purser and freight clerk of the Progreso, which the court estimates at the sum of $1,500, and the further sum of $7,350 as demurrage for 21 days, during which the Progreso was detained after the expiration of the lay days stipulated for in the charter party. The court finds the actual damages sustained by the cross libelant amount to at least $2,850 over and above all proper set-offs, and a decree in favor of the cross libelant will be entered against the libelant, in his capacity as receiver, for the sum last mentioned, payable only from the estate, if any, of the insolvent corporation. I disallow the claim of the cross libelant for the further sum of $8,000 paid for the steamboat D. R. Campbell. She may be worth as much or a great deal more than her cost, and, without evidence to show that her value is less than her cost, there is no basis for estimating damages on account of this transaction. The cross libelant has unnecessarily increased the expense of this law suit by swelling the volume of evidence by unnecessary matter, and repetitions and reiterations, so that it has been most difficult for the court to glean from the vast bulk of testimony the facts constituting the merits of the case. For this reason I direct that a clause be inserted in the decree requiring the respondent and cross libelant to pay 75 per cent. of the referee's fees for reporting the evidence.